# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

J.SH SECURITY INDUSTRIES D.C.S. LTD., *et al.*,

    Plaintiffs,

v.

BARTECH SYSTEMS INTERNATIONAL INC., *et al.*,

    Defendants.

Case No. 2:07-cv-277-LDG (GWF)

**Findings of Fact and Conclusions of Law**

    The parties entered into an agreement awarding plaintiffs the exclusive right to market defendant's hotel room refrigerators to the Sands. Despite this agreement, the defendant directly marketed and sold its refrigerators to the Sands. The plaintiffs brought this suit seeking to hold defendant liable for its conduct.

    Having considered the pleadings, admissible evidence, and arguments of the parties, the court concludes that the defendant breached the contract, breached the implied covenant of good faith and fair dealing, and intentionally interfered with the plaintiffs' prospective contractual relationship with the Sands. The following constitutes the court's findings of fact and conclusions of law.

The plaintiffs are J.SH Security Industries D.C.S. Ltd. and JSH International, Inc. ("JSH").  JSH manufactures and sells hotel room safes.  The defendant is Bartech Systems International, Inc. ("Bartech").  Bartech manufactures and sells semi-automated and fully automated hotel room refrigerators ("e-fridges").

After building the Venetian Hotel in Las Vegas, the Sands began development of the Palazzo tower as an additional phase of the Venetian Hotel.  The Sands planned on installing a safe and e-fridge in each of the approximately 3,000 rooms of the Palazzo.

Beginning in 2004 and continuing through early 2005, Bartech attempted to market its e-fridges to the Sands for the Palazzo.  Bartech recognized that its efforts were hampered, in part, because the Sands had installed a competitor's product in the first 4,000 rooms of the Venetian.  Further, the competitor could offer the Sands a global solution for the Palazzo; that is, the competitor could offer the Sands an e-fridge and a safe that interfaced together.  By April 2005, Bartech sent an e-mail to Pete Boyd of the Sands in which Bartech acknowledged learning that the Sands had already decided upon the product of Bartech's competitor.

JSH began selling its products to the Sands prior to 2005.

In April 2005, JSH and Bartech first met regarding the possibility of working together to market their products to the Sands for the Palazzo.  On August 14, 2005, Bartech and JSH entered into the "Americas Agreement."[1]  Pursuant to the Americas Agreement, Bartech gave JSH "Exclusive Rights to market the Bartech product to the Venetian Hotel chains in the Americas."  Stated in terms relevant to the present dispute, Bartech and JSH entered into a valid and binding contract pursuant to which Bartech agreed that JSH had

---

[1] The parties dispute whether JSH first approached Bartech or whether Bartech first approached JSH.  They also dispute whether the other party was the primary drafter of the Americas Agreement, thus requiring any ambiguities to be interpreted against the other side.  The court finds that neither JSH nor Bartech was the primary drafter, but that both are equally responsible for the ambiguities in the Americas Agreement.

the exclusive right to market Bartech's e-fridges to the Sands for its Palazzo tower project. This exclusive right was effective to December 31, 2006, but would be automatically extended to December 31, 2007, if "JSH will obtain orders of about 3000 various [e-fridges]." After signing the Americas Agreement, JSH timely commenced the performance of its obligations under that agreement.

During this same time period, the Sands was developing a project in Macau and Bartech was also attempting to market its e-fridges to the Sands for Macau.

On September 1, 2005, Bartech sent a Letter of Intent to JSH. Pursuant to the letter, Bartech would consider appointing JSH as an exclusive dealer for Macau. Bartech further stated "[t]his agreement shall not be effective unless it has been signed 3000 efridges for the Venetian Hotel in Las Vegas, NV (USA) before May 1st, 2006."[2]

On March 18, 2006, Bartech sent an e-mail to JSH. The e-mail references a meeting between the two entities that occurred the prior week. The e-mail then recites "the conditions for the Macau deal." Pursuant to the stated conditions, JSH could not take the purchase order for Macau and JSH would receive a 5% commission based on the purchase order, but such commission was only due if the Sands ordered an automatic e-fridge for Macau.

JSH's efforts to market Bartech e-fridges to the Sands for the Palazzo culminated in an April 16, 2006, meeting. At that meeting, which Bartech attended, JSH presented a written proposal directly to the Sands for Bartech e-fridges and JSH safes. The written proposal set forth the following as "hotel responsibilities": "25% down payment," "25% upon shipping date," and "Balance net 30." Following the meeting, JSH received a verbal

---

[2] None of the principal officers of JSH and Bartech involved in this dispute speak English as a first language. Nevertheless, English was the common language of the two companies, and the Americas Agreement, the Letter of Intent, and other written communications between the two entities were written in English. Throughout these Findings and Conclusions, the court has quoted the writings of JSH and Bartech exactly as written.

3

communication from the Sands that the Sands had decided to purchase Bartech's e-fridges from JSH. The Sands also notified JSH that subsequent changes might be made, such as the exact number of units and the final design and color.[3] Consistent with its prior dealings with the Sands, JSH considered this verbal communication to be a verbal order for e-fridges that would subsequently be followed with a written purchase order and a deposit or full payment.

By letter dated April 27, 2006, JSH represented to Bartech that the Sands formally notified JSH that it had been selected as the supplier of e-fridges. Attached to the letter was JSH's written order to Bartech for 3,036 e-fridges. JSH further represented to Bartech that the Sands had advised JSH that changes in the order might occur, and that the Sands requested 60 to 90 days to give details.

On May 17, 2006, JSH sent Bartech an e-mail stating "[o]n April 29, 2006 we placed with Bartech Las-Vegas office an order of 3000 Bartech Units. According to the agreement between us that 'if we shall place an order with Bartech for at least 3000 units for the Venetian, we shall become the exclusive distributors of Bartech in the Macau area.'" On May 23, 2006, Bartech sent an e-mail to JSH. The e-mail begins by asserting that "[i]t looks like you have forgotten what was agreed when we have meet in Las Vegas on March 7th." The e-mail continues by stating that "[t]he Letter of intent was denounced 2 months before we have received the Purchase Order for Las Vegas. . . ."

Bartech also generated, on May 23, 2006, an invoice to JSH for $425,040.00 for the 25% deposit for the Palazzo hotel. The invoice recites 3,036 Bartech e-fridges at $560.00

---

[3] JSH offered testimony that it received this communication through Pete Boyd. Though Bartech failed to timely identify Boyd as a trial witness, Bartech sought leave during the trial to call Boyd regarding this verbal communication. The court granted Bartech's request and permitted Boyd to testify. Boyd's testimony did not rebut or call into question JSH's evidence regarding the communication.

4

each, for a total estimated order of $1,700,160.00.  The invoice recites a due date of May 28, 2006.

During this time, the Sands was using a procurement company, World Sourcing Services Limited, for the procurement of vendors' products for the Sands' Palazzo project as well as projects in Macau.  On June 8, 2006, Bartech sent a letter to World Sourcing reciting the relationship between Bartech and JSH.

As to the Palazzo, Bartech acknowledged that it had entered into an agreement with JSH, and that "JSH who knew the relevant persons in Las Vegas have been handling the global[4] negotiations with Venetian Las Vegas since the beginning."  Bartech concluded that "[t]his situation is still accurate."

As to Macau, Bartech recited that Bartech and JSH had signed a Letter of Intent,[5] that the Letter of Intent was not an agreement, and that the subject of the Letter of Intent was the possibility that JSH would become an exclusive Bartech distributor for Macau. Bartech further stated that the "Validity Terms" included "To sign a contract for the sale of 3000 e-fridges to the Venetian in Las Vegas before May 1st, 2006.  As you informed me yesterday, no order was signed between Venetian Vegas and JSH to date.  Therefore, the condition stated in the letter of intent was not fulfilled, the letter is invalidated."

On June 13, 2006, Bartech sent JSH a letter, which begins: "We were just made aware by the Sands Group that they did not place any order for the Palazzo in Las Vegas though on April 27th, 2006, you placed an order from us for 3,036 Bartech efridges for a total amount of $1,700,160.00 for the same hotel and stated that you had received an order from the customer.  It is an outstanding issue."  The letter subsequently states: "If it

---

[4] The context of the Bartech letter indicates that the term "global" refers to negotiating the sale of both e-fridges and safes to the Palazzo, rather than a reference to the geographic extent of the negotiations.

[5] Bartech did not offer any evidence at trial that JSH signed the Letter of Intent.

5

happens to be true, this obvious breach of trust will de facto result in the unilateral termination of our agreement without notice . . . ."

Bartech concedes that, beginning in June 2006, it began negotiating with World Sourcing to have the Sands purchase e-fridges directly from Bartech rather than through JSH.  Bartech further notified World Sourcing that the Sands could not purchase Bartech e-fridges through JSH, but could only purchase Bartech e-fridges directly from Bartech.  Unless otherwise excused, this conduct by Bartech was in breach of the Americas Agreement.

On or about August 3, 2006, the Sands issued a purchase order to JSH for 3,000 safes.  The purchase order specified a "BARTECH INTERFACE FOR ON-LINE COMMUNICATION."

On November 15, 2006, the Sands issued a purchase order to JSH for 3,000 Bartech e-fridges.  After the Sands issued the purchase order to JSH, World Sourcing informed the Sands that the Sands could only purchase the Bartech e-fridge directly from Bartech.  On November 17, the Sands cancelled its purchase order to JSH.  On November 21, the Sands issued a purchase order to Bartech for 3,000 Bartech e-fridges.

Breach of Contract

Bartech argues that its conduct, which resulted in the Sands purchasing e-fridges directly from Bartech rather than through JSH, was justified and did not breach the Americas Agreement because JSH had, prior to Bartech's conduct, <u>twice</u> breached the Americas Agreement.  On the basis of its assertion that JSH was the first to breach the Americas Agreement, Bartech argues that it was discharged from its contractual obligations under that agreement.  *See, Bradley v. Nevada-California-Oregon Ry*., 42 Nev. 411, 412 (1919) ("If there is anything well settled it is that the party who commits the first breach of the contract cannot maintain an action against the other for a subsequent failure to perform.")

6

Bartech presents somewhat of a moving target as to JSH's first alleged breach. That is, although Bartech summarily asserts that JSH breached the Americas Agreement by its "misrepresentation . . . that it had received a purchase order" (Bartech Post-Trial Brief, p. 2, l. 21, and p.18, l. 16), it nevertheless argues that JSH breached an *implied* term of the Americas Agreement that either (a) "require[d] JSH to have a legally enforceable contract with [Sands] (i.e. a purchase order) before it obtain[ed] e-fridges from Bartech" (Bartech Post-Trial Brief, p.19, ll.10-12), or (b) that required JSH to "hav[e] a contract with [Sands] prior to purchase. . . ." (Bartech Post-Trial Brief, p. 21, ll. 23-25).  Thus, Bartech sets forth assertions or arguments based upon *three* distinct actions by JSH: (a) JSH's misrepresentations that it had received an order from the Sands, (b) JSH's obtaining of e-fridges from Bartech before getting a purchase order from the Sands, or (c) JSH's purchasing or ordering e-fridges from Bartech before getting a purchase order from the Sands.  Bartech contends that JSH also breached the Americas Agreement by failing to timely make a down payment on its order.  None of these alleged actions constitutes a breach of the Americas Agreement by JSH.

Bartech's argument that the Americas Agreement included an implied term that JSH was required to have a legally enforceable contract with the Sands before JSH obtained e-fridges is irrelevant because JSH did not obtain 3,000 Bartech e-fridges intended for the Sands prior to Bartech's breach.

Bartech's argument that the Americas Agreement included an implied term requiring JSH to have a written purchase order from the Sands before JSH could submit its purchase order to Bartech is without merit.  In support of its assertion that such an implied term exists, Bartech initially argues that the "only reasonable interpretation" of the Americas Agreement is that it controls "the manner in which JSH is to exclusively market the Bartech products to the Venetian Hotel chain in the Americas."  That is, Bartech argues that both its and JSH's duties under the agreement "are centered on sales to the Venetian hotel chain

7

in the Americas." The argument is irrelevant because JSH's order to Bartech expressly indicated that the e-fridges were for the Sands. Bartech has not offered any evidence that JSH submitted the purchase order to facilitate a sale of e-fridges to any entity other than the Sands. Further, the requirement that JSH could only sell Bartech's e-fridges to the Sands does not implicitly require that JSH *first* obtain a purchase order from the Sands before ordering e-fridges. Rather, such a requirement merely limited JSH to re-selling the e-fridges it purchased to the Sands.

Bartech's second argument–that the Americas Agreement had an implied term requiring JSH to *first* obtain a written purchase order from the Sands–arises from Paragraph 5 of the Americas Agreement. That paragraph states, in full:

> The terms of payment of JSH to Bartech will be linked to the terms of payment from the Venetian Hotel chains to JSH. It was agreed that these payment terms will include a down payment to Bartech and a full payment at completion of the installation.

Bartech asserts that the "only way to reconcile these sentences is by interpreting [them] as meaning that JSH must negotiate for and receive both a down payment and a final payment at completion, but the size of the down payment and the size and timing of any additional payments is 'linked' to how JSH is paid by [the Sands]." Bartech Post-Trial Brief, p.20, ll.23-27.

The court finds that the first sentence linked the <u>terms of payment</u> from JSH to Bartech to the <u>terms of payment</u> from the Sands to JSH. A down payment is a term of payment. Although generally paid at the time of sale, the parties could alter the timing of the down payment. While the second sentence of Paragraph 5 requires that the terms of payment between JSH and Bartech include a down payment to Bartech, the first sentence establishes the timing of that down payment. Paragraph 5 altered the timing of JSH's down payment obligation by linking it to the Sands' obligation to make a down payment to

JSH.[6]  Neither the first nor second sentence of Paragraph 5, however, <u>requires</u> that the timing of the Sands' down payment obligation precede the timing of JSH's order to Bartech.[7]

Bartech's argument that JSH breached the Americas Agreement by misrepresenting that they had obtained a purchase order fails for several reasons.  The Court finds that JSH did not represent to Bartech that JSH had received a written purchase order from the Sands.  Rather, after the April 16, 2006, meeting between JSH and Sands (which Bartech attended), JSH received a verbal communication from the Sands.  JSH considered the verbal communication to be a verbal order for the e-fridges to be installed in the Palazzo.  JSH expected that, consistent with prior dealings, the Sands would subsequently issue a written purchase order.  On April 27, 2006, JSH represented to Bartech that the Sands formally notified JSH that it had been selected as the supplier of e-fridges.

Further, Bartech has not directed the court's attention to any express term of the Americas Agreement breached by JSH's conduct in representing that the verbal communication it received from the Sands was a verbal order.  Likewise, Bartech has not offered any argument that the Americas Agreement includes an implied term breached by JSH's representation regarding the verbal communication it received from the Sands.

The court disagrees with Bartech's argument that the Letter of Intent, and its May 1st, 2006, deadline, gave JSH a "substantial motive" to misrepresent to Bartech that it had received an order from the Sands.  Rather, the Letter of Intent gave JSH a substantial

---

[6]  The Court disagrees with JSH's assertion, stated at page 14, lines 18-19 of its post-trial brief, that Bartech got paid when JSH got paid.  The first sentence of Paragraph 5 does not "link" payments, but links the "terms of payment."  At a minimum, Paragraph 5 required that, in the circumstance of JSH placing an order with Bartech and the Sands placing an order with JSH, JSH became <u>obligated</u> to pay Bartech when the Sands became <u>obligated</u> to pay JSH, regardless of whether the Sands actually paid JSH.

[7]  While Paragraph 5 linked the timing and amount of payments if the Sands issued a purchase order, it did not excuse JSH's obligations to Bartech if JSH submitted an order but then failed to obtain a purchase order from the Sands.

9

motive to sign an order for 3,000 e-fridges. The Letter of Intent, which was written by Bartech, is at best ambiguous. The letter states that "[t]his agreement shall not be effective unless it has been signed 3000 efridges for the Venetian Hotel in Las Vegas, NV (USA) before May 1st, 2006." As shown by its May 17th e-mail to Bartech, and as shown by its placement of an order with Bartech for 3,000 e-fridges for the Venetian, JSH construed the Letter of Intent as requiring that JSH sign an order with Bartech for 3,000 e-fridges for the Venetian before May 1st, 2006. Thus, Bartech's asserted promise–to consider JSH as an exclusive dealer for Macau–motivated JSH to sign an order for 3,000 e-fridges before May 1, 2006.

        Finally, the court finds that JSH's obligation to pay a down payment to Bartech was not due prior to Bartech's breach of the Americas Agreement. As discussed above, and as this court ruled in denying Bartech's motion for summary judgment on this issue, pursuant to Paragraph 5 of the Americas Agreement, the timing (or due date) of JSH's down payment to Bartech was linked to the Sands' obligation to make a down payment to JSH. JSH's down payment to Bartech was not yet due at the time of Bartech's breach because the Sands was not yet obligated to make a down payment to JSH. While Bartech issued an invoice to JSH asserting that the due date for the down payment was May 28, 2006, such due date was inconsistent with the Americas Agreement. As the Americas Agreement required any change to be signed by both parties, and as JSH did not sign the invoice, the due date on the invoice did not alter the terms of the Americas Agreement. Accordingly, as this court previously ruled, JSH's down payment to Bartech was not due prior to Bartech's breach.

        As Bartech breached the Americas Agreement, and as JSH did not breach the Americas Agreement, JSH is entitled to damages arising from Bartech's breach.

10

Breach of the Implied Covenant of Good Faith and Fair Dealing

Bartech's conduct was also in breach of the covenant of good faith and fair dealing that, under Nevada law, is implied in every contract. *See A.C. Shaw Const. v. Washoe County,* 105 Nev. 913, 914 (1989). For the same reasons that Bartech is liable on JSH's claim for breach of contract, Bartech is liable on JSH's claim for breach of the implied covenant of good faith and fair dealing.

Intentional Interference with Contractual Relations and with Prospective Business Advantage

To establish an intentional interference with prospective business advantage, JSH was required to show (a) a prospective contractual relationship between JSH and the Sands, (b) Bartech's knowledge of the prospective relationship, (c) Bartech's intent to harm JSH by preventing the relationship, (d) the absence of privilege or justification by Bartech, and (e) actual harm to JSH as a result of Bartech's conduct. See, Leavitt v. Leisure Sports, Inc., 103 Nev. 81, 88 (1987). The elements of the tort of intentional interference with a contract are similar but concern a valid and existing contract rather than a prospective contract. *See, Sutherland v. Gross*, 105 Nev. 192, 196 (1989).

Prior to November 15, 2006, Bartech engaged in conduct intended to disrupt a prospective contract between JSH and the Sands. That conduct included an instruction to World Sourcing that the Sands could not purchase e-fridges from JSH. On November 15, 2006, the Sands issued its purchase order to JSH. The purchase order was a valid and existing contract. On November 17, 2006, the Sands cancelled the order. The Sands acted upon information received from World Sourcing that World Sourcing had received from Bartech before the Sands issued the purchase order. In short, the evidence established that Bartech interfered with JSH's prospective contract with the Sands but not with JSH's contract during the time that contract existed. Bartech was not justified or privileged to engage in its intentionally disruptive conduct. JSH's placement of an order for

3,000 e-fridges for the Sands comported with the terms of the Americas Agreement. Accordingly, JSH is entitled to damages on its claim for intentional interference with a prospective contractual relationship but not on its claim for interference with a contractual relationship.

Damages

On November 21, 2006, the Sands issued a purchase order to Bartech for 3,000 fully automated e-fridges with an internal capacity of 55 liters and with 41 sensors. On April 30, 2007, the Sands revised its November 21, 2006, purchase to reflect that it was purchasing 3,000 fully automated e-fridges with an internal capacity of 65 liters and with 41 sensors. The cost per unit was $811.00  Bartech argues that JSH's damages should be measured by the price JSH was willing to accept for the 55 liter e-fridge, as evidenced by the Sands' November 15, 2006, purchase order to JSH. The revised purchase order to Bartech, however, establishes the model that the Sands would have ordered from JSH and the amount that the Sands would have paid to JSH in the absence of Bartech's conduct.

Pursuant to the Americas Agreement, the cost to JSH for a fully automated Bartech e-fridge with an internal capacity of 65 liters and with 41 sensors was $570.00. Bartech argues that this price was only guaranteed for six months, and that the price was "linked to Bartech general price list" after the six-month price guarantee expired. Bartech contends that, pursuant to this language, JSH's cost for the e-fridges increased to the price quoted on Bartech's general price list when the six-month price guarantee expired.

The argument is inconsistent with and contradicted by Bartech's own conduct. Pursuant to the Americas Agreement, JSH could purchase the 55 liter e-fridge for $560. On May 23, 2006, three months after the price-guarantee expired, Bartech issued an invoice to JSH quoting a price of $560.00 for the 55 liter e-fridges. Bartech's invoice establishes that the language linking the price to JSH to Bartech general price list did not cause the price to JSH to become the general price when the six-month price guarantee

expired. Rather, the language linking the price to JSH to Bartech general price list did not cause the price to JSH to be increased or otherwise adjusted when the six-month price guarantee expired. Accordingly, JSH's cost for the 65 liter Bartech e-fridge was $570.00.

The difference between the $811 price that Sands' paid for the e-fridges and the $570 price at which JSH represents a profit of $241 per unit that JSH lost because of Bartech's breach. As the Sands purchased 3,000 e-fridges, JSH's damages resulting from lost profits on all units purchased by the Sands is $723,000.00.

Bartech also obtained a licensing and maintenance fee of $.07 per day per room from the Sands. As the Sands purchased 3,000 e-fridges, the total fee for one year was $76,650. Pursuant to the Americas Agreement, Bartech agreed to guarantee its e-fridges for a period of one year, subsequent to which Bartech would make a separate service agreement directly with the Sands. Absent Bartech's breach, JSH would have received this licensing and maintenance fee for one year while Bartech would have provided the servicing pursuant to the Americas Agreement. Accordingly, JSH was further damaged in the amount of $76,650.00.

JSH argues that its damages include the shipping and installation costs for each e-fridge. In support of the argument, JSH asserts that the cost to JSH under the Americas Agreement was a "turnkey" price, and that "turnkey" meant that the price to JSH *included* Bartech's shipping and installation of the e-fridges. JSH further asserts that the Sands paid these shipping and installation charges to Bartech. As such, but for Bartech's breach, the Sands would have paid JSH for the shipping and installation but Bartech would have been obligated to pay the shipper and installer. JSH is not entitled to damages arising from shipping and installation because it did not meet its burden of showing that the "turnkey" price quoted in the Americas Agreement included shipping and installation by Bartech.

The total damages to which JSH is entitled is $799,650.00.

Punitive Damages.

An award of punitive damages is not appropriate.

DATED this _____ day of August, 2010.

_____
Lloyd D. George
United States District Judge